RECEIVED
MAY 21 2008
U.S.D.C. S.D.N.Y.
CASHIERS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

MBIA INC.,                                    :        ECF CASE

                Plaintiff,        :        08 Civ. 4313 (RMB) (DFE)

      -against-                          :        **AMENDED COMPLAINT**

FEDERAL INSURANCE COMPANY and   :        **JURY TRIAL DEMANDED**
ACE AMERICAN INSURANCE COMPANY,

                :

             Defendants.        :

                :
- - - - - - - - - - - - - - - - - - - - - - - - - - - -x

       Plaintiff MBIA Inc. ("MBIA") by and through its attorneys, Howrey LLP, as and for its

Complaint, alleges as follows:

## NATURE OF THE CASE

    1.     This is a civil action for breach of contract and for declaratory judgment that

MBIA brings against Federal Insurance Company ("Federal") and ACE American Insurance

Company ("ACE") (collectively "Defendants") under primary and excess Directors and Officers

("D&O") liability insurance policies that Defendants sold to MBIA.  MBIA seeks to enforce its

rights to coverage under Defendants' D&O insurance policies for the following:  (i) MBIA's

total defense costs arising out of certain investigations brought by the Securities and Exchange

Commission ("SEC") and the New York Attorney General ("NYAG") (collectively the

"regulators"); (ii) the costs of an "Independent Consultant" that MBIA was legally obligated to

pay pursuant to settlements with the regulators; (iii) MBIA's total defense costs arising out of

certain shareholder derivative actions filed against certain of MBIA's directors and officers; and

(iv) any loss (including any defense costs or legal liability) arising out of a class action filed

against MBIA by certain purchasers of MBIA's stock.  The regulatory investigations, the shareholder derivative actions, and the class action (collectively "the Underlying Claims") all allege violations of federal and/or state securities law.

2.      The terms of the D&O insurance policies that Defendants sold to MBIA obligate Defendants to indemnify MBIA for both defense costs and any legal liability incurred in connection with the Underlying Claims.  Notwithstanding the fact that MBIA already has incurred defense costs and legal liability in connection with the Underlying Claims that greatly exceeds the $15 million limit of Federal's policy, Federal contends that it only has limited coverage obligations with respect to the Underlying Claims and has refused to provide coverage to MBIA for a substantial portion of those defense costs and legal liability.  In addition, notwithstanding the fact that MBIA already has incurred defense costs and legal liability in connection with the Underlying Claims that impacts ACE's first-layer excess policy, ACE has refused to provide MBIA with any coverage to date.

3.      Both Federal and ACE unreasonably have refused to consent to MBIA's settlement of the class action, thereby exposing MBIA to further defense costs and greater potential legal liability.

4.      Accordingly, MBIA seeks damages for Defendants' breaches of their contractual obligations to indemnify MBIA in full for the defense costs, as well as the cost of the Independent Consultant, that MBIA has incurred to date with respect to the Underlying Claims. MBIA also seeks a judgment declaring that Defendants have an obligation to indemnify MBIA for all defense costs that MBIA has incurred, or will incur, as well as any legal liability that MBIA incurs with respect to settlements, judgments, or damages in connection with the class action.

2

**THE PARTIES**

5.      Plaintiff MBIA is a corporation organized under the laws of the State of Connecticut with its principal place of business at 113 King Street, Armonk, New York, 10504.

6.      Defendant Federal is a corporation organized under the laws of the State of Indiana with its principal place of business at 15 Mountainview Road, Warren, New Jersey, 07059.  Federal is doing business in New York or has transacted business in New York out of which the claims arise.

7.      Defendant ACE is a corporation organized under the laws of the Commonwealth of Pennsylvania with its principal place of business at 436 Walnut Street, Philadelphia, PA, 19106.  ACE is doing business in New York or has transacted business in New York out of which the claims arise.

**JURISDICTION AND VENUE**

8.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between MBIA and both Defendants and the amount in controversy exceeds the sum or value of $75,000 exclusive of interest and costs.

9.      This Court has subject matter jurisdiction over the declaratory judgment action pursuant to 28 U.S.C. § 2201 and Federal Rule of Civil Procedure 57.

10.     This Court has personal jurisdiction over the Defendants pursuant to Federal Rule of Civil Procedure 4(e) and (h), and §§ 301 and 302(a)(1) of the New York Civil Practice Law and Rules.  This action arises out of contracts for insurance between MBIA and Defendants that were performable in whole or in part in New York.  In addition, this action arises out of Defendants' transaction of business in New York, specifically, Defendants' sale and issuance of contracts of insurance to MBIA in New York.

3

11.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(a) and (c).

**THE SUBJECT INSURANCE POLICIES**

12.     Federal sold to MBIA Executive Liability and Indemnification Policy No. 7023-4658 ("Federal Policy") for the period February 15, 2004 to February 15, 2005.  *See* Exhibit A attached hereto.

13.     The Federal Policy has a $15 million liability limit, subject to a $2.5 million deductible, and provides:  (i) coverage to MBIA's directors and officers for "Loss" arising from alleged "Wrongful Acts"; (ii) coverage to MBIA for any indemnification that MBIA must pay to its directors and officers for "Loss" arising from alleged "Wrongful Acts"; and (iii) direct "entity" coverage to MBIA for "Securities Loss" arising from a "Securities Claim."

14.     The Federal Policy defines a "Loss" as, *inter alia*, "the total amount which any Insured Person becomes legally obligated to pay on account of each Claim and for all Claims . . . made against them for Wrongful Acts for which coverage applies, including, but not limited to, damages, judgments, settlements, costs and Defense Costs."

15.     The Federal Policy is a "claims made" policy, meaning that it is triggered by a Claim first made against an insured during its policy period for a Wrongful Act allegedly committed before or during its policy period.

16.     The Federal Policy defines a "Claim" as:

    a.     a written demand for monetary damages;

    b.     a civil proceeding commenced by the service of a complaint or similar pleading;

    c.     a criminal proceeding commenced by a return of an indictment;

    d.     a formal administrative or regulatory proceeding commenced by the filing of a notice of charges, formal investigative order or similar document, or

4

      e.      an informal administrative or regulatory proceeding or inquiry commenced by the filing of a notice of charges, formal or informal investigative order or similar documents, as it relates solely to a Securities Claim,

against any insured Person for a Wrongful Act, including any appeal therefrom.

17.      The Federal Policy defines "Wrongful Act" as "any error, misstatement, misleading statement, act, omission, neglect or breach of duty committed, attempted, or allegedly committed or attempted, by any Insured Person or [MBIA] based upon, arising from, or in consequence of a Securities Transaction."

18.      The Federal Policy considers all "causally connected Wrongful Acts" to be "Interrelated Wrongful Acts."

19.      The Federal Policy defines "Securities Loss" as "the total amount, which any Insured Person, solely or jointly with [MBIA], becomes legally obligated to pay on account of a Securities Claim, including but not limited to damages, punitive or exemplary damages, judgments, settlements, costs and Securities Defense Costs . . . ."

20.      The Federal Policy defines "Securities Claim" as:

      i.      a written demand for monetary damages,

      ii.      a civil proceeding commenced by the service of a complaint or similar pleading,

      iii.      a formal or informal administrative or regulatory proceeding or inquiry commenced by the filing of a notice of charges, formal or informal investigative order or similar document,

      iv.      a criminal proceeding commenced by the return of an indictment,

which, in whole or in part, is based upon, arises from or is in consequence of the purchase or sale of, or offer to purchase or sell, any securities of the Organization.

5

21.     The Federal Policy defines "Defense Costs" as "that part of Loss consisting of reasonable costs, charges, fees (including but not limited to attorneys' fees and experts' fees) and expenses (other than regular or overtime wages, salaries or fees of the directors, officers or employees of the Organization) incurred in defending or investigating Claims and the premium for appeal, attachment or similar bonds." The Federal Policy also has a definition of "Securities Defense Costs" which is substantially the same as the above. Accordingly, for the purposes of simplicity, all references to such costs herein will be merely to Defense Costs.

22.     The Federal Policy states that MBIA has agreed "not to settle any Claim . . . without [Federal's] written consent, which shall not be unreasonably withheld."

23.     ACE sold to MBIA Integrated Excess Insurance Policy No. DOX G21670029 001 ("ACE Policy"). This is a first-layer excess policy that provides coverage for the same period as the Federal Policy. The ACE Policy "follows form" to the Federal Policy and provides an additional $15 million in coverage above the Federal Policy's limit. *See* Exhibit B attached hereto.

24.     The ACE Policy's Limit of Liability section provides that the ACE Policy attaches after the amount of the Underlying Limits has been paid. The ACE Policy also provides, *inter alia*, that if MBIA does not maintain any Underlying Policies, "[ACE] shall not be liable under the policy to a greater extent than it would have been had such Underlying Policies been so maintained." These provisions confirm that ACE's obligation to provide MBIA with coverage under its Policy attaches to any covered Loss that exceeds the Federal Policy's $15 million limit, regardless of whether Federal, itself, has paid those limits.

6

25.     The costs that MBIA has paid in defending the Underlying Claims, as well as the costs of the Independent Consultant, far exceed the Federal Policy's $15 million liability limit and, therefore, also presently reach the ACE Policy.

26.     MBIA has complied with all of the conditions precedent to coverage under the Federal and ACE Policies, including, without limitation, the payment of all premiums to Defendants.  Alternatively, any such condition precedent that allegedly has not been fulfilled by MBIA is inapplicable because of waiver, estoppel, excuse, laches, or lack of prejudice.

### BACKGROUND OF THE REGULATORY INVESTIGATIONS

27.     MBIA is the world's largest bond insurer.  Bond insurers enhance the safety of municipal and other bonds, making them more appealing to investors, by assuming responsibility for the timely payment of interest and principal if the issuer fails to meet its obligations.  MBIA financial guarantee insurance benefits issuers by reducing their cost of borrowing, easing their access to capital and increasing the marketability of their bonds.

28.     MBIA provided financial guarantee insurance on bonds issued by the Delaware Valley Obligated Group of the Allegheny Health, Education and Research Foundation ("AHERF"), a hospital association based in Pittsburgh, Pennsylvania.  In 1998, when AHERF defaulted on its payment obligation on more than $250 million in insured bonds, MBIA became obligated to make timely payments of interest and principal on those bonds.  In order to help mitigate the impact of the loss to MBIA resulting from that default, MBIA entered into two sets of transactions with three reinsurers.

29.     On March 9, 2001, the SEC issued an Order Directing Private Investigation and Designating Officers to Take Testimony ("Formal Order"), to investigate companies that purchased certain loss-mitigation insurance products.

7

30.     On November 17, 2004, during the periods of the Federal and ACE Policies, the SEC, pursuant to the Formal Order, served a subpoena on MBIA with respect to the AHERF reinsurance transactions.

31.     The NYAG served MBIA with an identical subpoena on November 18, 2004.

32.     The SEC subsequently issued additional subpoenas with respect to the AHERF investigation and broadened the scope of its investigation beyond the AHERF reinsurance transactions to include other means by which MBIA might have improperly hidden losses in violation of generally accepted accounting principles ("GAAP") and the federal securities laws. Among other things, the SEC broadened its investigation to also include certain of MBIA's transactions with or involving a company named Capital Asset, as well as certain transactions involving aircraft leased by US Airways.

33.     Capital Asset was in the business of purchasing and servicing delinquent tax liens. The SEC investigated MBIA's investment in Capital Asset, as well as financial guarantee policies that MBIA issued with respect to three securitizations of tax liens acquired by Capital Asset. MBIA's transactions with and involving Capital Asset resulted in losses to MBIA. The SEC investigated whether MBIA's accounting for and disclosures concerning its transactions with Capital Asset were consistent with GAAP and the federal securities laws.

34.     With respect to US Airways, the SEC investigated a transaction that involved MBIA's remediation with respect to certain Enhanced Equipment Trust Certificates issued by the US Airways 1998-1 Repackaging Trust (the "EETCs") and secured by aircraft leased by US Airways. MBIA voluntarily paid off the financial guarantee insurance policy it had issued with respect to the EETCs and took effective ownership of the aircraft. The SEC investigated whether MBIA's accounting for and reporting of this transaction as an investment in the collateral rather

8

than as a loss under its guarantee policy was appropriate under GAAP and/or the federal securities laws.

35.     In January 2007, MBIA entered into formal settlements with the SEC and the NYAG regarding their investigations. Pursuant to those settlements, MBIA became legally obligated to retain and pay the costs of an "Independent Consultant" to take over the investigation concerning whether MBIA's accounting and disclosures with respect to Capital Asset and US Airways were consistent with GAAP and the federal securities laws. The Independent Consultant thereafter conducted an investigation focused on the transactions involving Capital Asset and US Airways.

36.     The Independent Consultant filed its final report on July 24, 2007, in which it concluded that MBIA did not violate GAAP or the federal securities laws in connection with accounting for or disclosure of the Capital Asset or US Airways transactions.

## BACKGROUND OF THE SECURITIES CLASS ACTION AND SHAREHOLDER DERIVATIVE ACTIONS

37.     In addition to the regulatory investigations, MBIA's current and former shareholders filed private lawsuits against MBIA and its directors and officers.

38.     In *In re MBIA Inc. Securities Litigation*, No. 05-CV-03514 (S.D.N.Y. filed Oct. 3, 2005) (the "Class Action"), plaintiffs alleged that MBIA and certain of its directors and officers had engaged in improper accounting practices to artificially inflate MBIA's financial statements and that MBIA and certain of its directors and officers had engaged in a fraudulent scheme to deceive the investing public with respect to the AHERF reinsurance transactions. These plaintiffs sought to represent a class of purchasers of MBIA stock between August 5, 2003 and March 30, 2005.

9

39.     On February 15, 2007, Judge Louis L. Stanton, of the United States District Court for the Southern District of New York, dismissed the Class Action on statute-of-limitations grounds.  Plaintiffs have appealed from that dismissal to the United States Court of Appeals for the Second Circuit.  That appeal is pending.

40.     After the appeal was taken, the class-action plaintiffs made a specific settlement demand on MBIA.  In response to this demand, MBIA determined that it would be appropriate and prudent to consider settlement of those claims.  MBIA sought the consent of Federal and ACE to make a counter-proposal to settle the Class Action.  Both Federal and ACE refused to provide their consent.  Because of Federal's and ACE's refusals, MBIA has not engaged in any further settlement talks with the plaintiffs.

41.     In addition to the Class Action, MBIA shareholders brought two derivative actions against MBIA's directors and officers, *Purvis v. Brown*, No. 20099-05 (N.Y. Sup. Ct., Westchester Cty. filed Nov. 9, 2005) ("*Purvis*") and *Orton v. Brown*, No. 06-CV-3146 (S.D.N.Y. filed Apr. 24, 2006) ("*Orton*") (collectively the "Derivative Actions").  The Derivative Actions alleged, *inter alia*, that MBIA's current and former directors and officers breached their fiduciary duties to MBIA and its shareholders by undertaking, acquiescing in, or approving certain acts related to the reinsurance agreements entered into to mitigate the impact of the loss resulting from the AHERF default and recording or accounting for those transactions.

42.     Following the completion and filing of a report by a special committee of independent directors of MBIA rejecting certain of the claims and concluding that pursuit of the remaining claims was not in the best interests of MBIA and its shareholders, both derivative actions were dismissed pursuant to agreements reached by the parties, with no payment by MBIA and with each side paying its own litigation costs.

DM_US:21238538_1

## FEDERAL'S AND ACE'S DENIALS OF COVERAGE

43.     Federal and MBIA have engaged in discussions regarding Federal's coverage

obligations for more than a year now.  Despite the fact that MBIA has incurred defense costs that

greatly exceed the Federal Policy's $15 million liability limit, Federal has agreed to pay MBIA

only $6.4 million to date, which represents $8.9 million in defense costs that Federal

acknowledges are covered, minus the Federal Policy's $2.5 million deductible.  Federal has

denied that it has any further obligation to provide coverage to MBIA with respect to the

Underlying Claims.

44.     Federal's coverage denial is premised on the following purported bases:

a.     That the NYAG investigation does not constitute a "Securities Claim" within the
meaning of the Federal Policy's language;

b.     That the Capital Asset and US Airways investigations do not constitute
"Securities Claims" within the meaning of the Federal Policy's language;

c.     The Independent Consultant's costs for which MBIA is liable under the
regulatory settlements are not covered because they do not arise from a Securities Claim and do
not constitute a Loss or a Securities Loss; and

d.     A $200,000 sub-limit applies to certain of the defense costs associated with the
Derivative Actions.

ACE has joined Federal in the above positions.

45.     Also, notwithstanding that defense costs are greater than $15 million and thus

have exceeded the level at which the ACE coverage attaches, thereby obligating ACE to

reimburse MBIA for such costs, ACE has declined to make any payments, arguing that its Policy

will not attach unless and until Federal has paid to MBIA amounts equaling the Federal Policy's

$15 million liability limit.  In other words, according to ACE, it owes MBIA nothing regardless

of whether the total amount of costs and/or legal liability that MBIA incurs exceeds the liability

limit of the Federal Policy, so long as Federal has not paid to MBIA the full amount of the Federal Policy's liability limit.

46.    Defendants' purported bases for denying their coverage obligations with respect to the Underlying Claims are without merit.

47.    With respect to the NYAG investigation, Defendants' principal basis for arguing that it does not constitute a "Securities Claim" is the fact that it was commenced by a subpoena which, according to Defendants, does not constitute a "formal or informal investigative order or similar document" as required under the Federal Policy language.  Defendants are incorrect because, as a matter of general practice, the NYAG does not issue a formal order before commencing an investigation.  In addition, given that a subpoena has the weight of legal compulsion, it certainly should constitute, at a minimum, a "similar document" that commences an investigation within the meaning of the Federal Policy language.  If Defendants were correct in their position, it would render illusory much of the coverage they sold to MBIA because it would mean that MBIA, which has its principal place of business in New York, purchased coverage for Securities Claims that did *not* include securities investigations brought by the NYAG.

48.    With respect to the Capital Asset and US Airways investigations, Defendants argue that those investigations do not constitute "Securities Claims" because they were not commenced by a "formal or informal investigative order or similar document" but rather involved only informal document requests.  In fact, the Capital Asset and US Airways investigations were extensions of the SEC's initial investigation into the AHERF transactions, which Federal acknowledged did, in fact, constitute a "Securities Claim."  Indeed, the SEC has inherent powers to expand any investigation to include additional transactions and all of the

12

investigations that began with the AHERF investigation were based upon the SEC's overriding investigation into whether MBIA had used impermissible means to affect the timing or amount of revenue, expense or loss that MBIA recognized in any particular reporting period. Accordingly, the Capital Asset and US Airways investigations were commenced by the same document that commenced the AHERF investigation and, therefore, constitute Securities Claims within the meaning of the Federal Policy language.  Furthermore, pursuant to the Federal Policy's plain language, a "Securities Claim" may be commenced formally or *informally* by an investigative order or a "similar document."  Therefore, even if the SEC's investigation into the Capital Asset and US Airways transactions began merely with informal document requests, those investigations still fall within the scope of Federal's very broad policy language.

49.     The Defendants have raised several purported bases for denying coverage for the Independent Consultant's costs including:  (i) that they relate to the Capital Asset and US Airways transactions which, as set forth above, Defendants argue are not covered; (ii) they purportedly do not constitute an "administrative or regulatory proceeding or inquiry" as required under the Federal Policy language; and (iii) MBIA purportedly is barred from seeking coverage for the Independent Consultant's costs under the terms of its settlement with the regulators. Defendants are incorrect with respect to all of these positions.  First, as set forth above, the Capital Asset and US Airways transactions are, in fact, "Securities Claims" within the meaning of the Federal Policy language.  Second, the Independent Consultant's work is part of a regulatory proceeding because the regulators imposed on MBIA the legal obligation to retain, and pay for, the Independent Consultant to continue the regulators' investigations.  Third, the regulatory settlements do not bar MBIA from seeking insurance coverage for the Independent Consultant's costs.

50.     With respect to the Derivative Actions, Defendants contend that much of MBIA's defense costs are not actually "Defense Costs" but, rather, merely are "Investigation Costs" for which there is a $200,000 sub-limit under the Federal Policy.  In reality, although defense counsel did investigate the merits of the shareholders' derivative *demands* prior to the filing of the lawsuits, defense counsel began litigation defense work once the shareholders filed the two Derivative Actions.    Specifically, once *Purvis* was filed in November 2005, all of the associated fees, costs, and expenses that MBIA incurred thereafter were Defense Costs within the meaning of Defendants' policies.  Likewise, once *Orton* was filed in April 2006, all of the associated costs, and expenses were Defense Costs within the meaning of Defendants' policies.  In short, the vast majority of the costs incurred with respect to the Derivative Actions are covered Defense Costs and are not mere Investigation Costs.

51.     Finally, ACE's position that its policy will not attach unless Federal, itself, pays its full policy limits, even if MBIA's Loss greatly exceeds Federal's limits, runs counter to (i) its own policy language, which indicates that ACE's obligation attaches if a loss exceeds the amount of the underlying insurance, regardless of whether an underlying insurer has paid its policy's limits; (ii) controlling judicial authority; and (iii) public policy.

52.     MBIA explained to Federal and ACE why the above positions are incorrect. Federal and ACE have nevertheless refused to change their coverage positions.

53.     In addition, although Federal has agreed to pay, and has paid, most of MBIA's defense costs incurred in connection with the Class Action, Federal also reserved its rights to ultimately deny coverage to MBIA for all such costs as well as any damages or other costs incurred through settlement or judgment.  ACE has similarly reserved its rights.  Defendants' failure to consent to MBIA's making efforts to settle the Class Action was not reasonable and,

DM_US:21238538_1

given that Defendants have reserved their rights to deny coverage, MBIA has been improperly

exposed to the possibility of having to incur further defense costs as well as the possibility of

incurring a greater legal liability than MBIA would have incurred through settlement.  Based on

Defendants' coverage denials with respect to the regulatory investigations and Derivative

Actions, it is possible, if not likely, that Defendants also will deny coverage for some, if not all,

of any defense costs or any legal liability incurred in connection with the Class Action.

**FIRST CLAIM FOR RELIEF**
**Breach of Contract – Duty to Pay in Full the Total Defense Costs**
**Relating to the SEC and NYAG Investigations**

54.     MBIA repeats and realleges paragraphs 1 through 53, as if set forth fully herein.

55.     The insurance policies that Defendants sold to MBIA obligate Defendants to pay

in full MBIA's total defense costs arising from both the SEC and NYAG regulatory

investigations.

56.     Defendants have breached their contractual and common law obligations to

MBIA by their failure and refusal to fulfill their obligations to, among other things, pay in full

MBIA's total defense costs in the SEC and NYAG regulatory investigations.

57.     As a direct and proximate cause of Defendants' breaches of contract, which

continue to at least the time of the filing of this Complaint, Defendants have deprived MBIA of

the benefits of the insurance contracts, for which MBIA paid substantial premiums.  MBIA has

sustained damages due to Defendants' breaches of contract.

15

## SECOND CLAIM FOR RELIEF
**Breach of Contract – Duty to Indemnify for MBIA's Legal Liability to Pay the Costs of the Independent Consultant Required Under the Regulatory Settlements**

58.    MBIA repeats and realleges paragraphs 1 through 53, as if set forth fully herein.

59.    The insurance policies that Defendants sold to MBIA obligate Defendants to indemnify and pay in full MBIA's Securities Loss resulting from Securities Claims, including all sums spent in settlements, judgments, or damages in connection with the SEC and NYAG investigations.

60.    Defendants have breached their contractual obligations to MBIA set forth in their insurance policies by their failure and refusal to indemnify MBIA and pay in full the costs of the work performed by the Independent Consultant for which MBIA is legally liable under the terms of MBIA's settlements with the regulators.

61.    As a direct and proximate result of Defendants' breaches of contract, which continue to at least the time of the filing of this Complaint, Defendants have deprived MBIA of the benefits of the insurance contracts, for which MBIA paid substantial premiums.  MBIA has sustained damages due to Defendants' breaches of contract.

## THIRD CLAIM FOR RELIEF
**Breach of Contract – Duty to Pay in Full the Total Defense Costs for the Derivative Actions**

62.    MBIA repeats and realleges paragraphs 1 through 53, as if set forth fully herein.

63.    The insurance policies that Defendants sold to MBIA obligate Defendants to pay MBIA in full the total costs of defending certain of its directors and officers in the Derivative Actions.

16

64.     Defendants have breached their contractual obligations to MBIA by their failure and refusal to pay MBIA in full the total costs of defending certain of its directors and officers in the Derivative Actions.

65.     As a direct and proximate result of Defendants' breaches of contract, which continue to at least the time of the filing of this Complaint, Defendants have deprived MBIA of the benefits of the insurance contracts, for which MBIA paid substantial premiums.  MBIA has sustained damages due to Defendants' breaches of contract.

### FOURTH CLAIM FOR RELIEF
**Declaratory Judgment – Duty to Pay in Full the**
**Total Loss Arising From the Class Action**

66.     MBIA repeats and realleges paragraphs 1 through 53, as if set forth fully herein.

67.     The insurance policies that Defendants sold to MBIA obligate Defendants to pay in full any Securities Loss or Loss that MBIA incurs in connection with the Class Action, including all defense costs, as well as all damages or other liabilities that may be incurred in connection with settlements or judgments in the Class Action.

68.     Defendants have unreasonably withheld consent for MBIA to pursue a settlement of the Class Action.  Defendants also have reserved their rights with respect to the Class Action and have, therefore, refused to acknowledge that, pursuant to the terms of their insurance policies, they must indemnify and pay in full any Securities Loss or Loss MBIA incurs in connection with the Class Action, including all defense costs, as well as all damages or other liabilities that may be incurred in connection with settlements or judgments in the Class Action. Accordingly, an actual and justiciable controversy presently exists between MBIA and Defendants as to whether Defendants must pay in full any Securities Loss or Loss MBIA incurs

50.     With respect to the Derivative Actions, Defendants contend that much of MBIA's defense costs are not actually "Defense Costs" but, rather, merely are "Investigation Costs" for which there is a $200,000 sub-limit under the Federal Policy.  In reality, although defense counsel did investigate the merits of the shareholders' derivative *demands* prior to the filing of the lawsuits, defense counsel began litigation defense work once the shareholders filed the two Derivative Actions.    Specifically, once *Purvis* was filed in November 2005, all of the associated fees, costs, and expenses that MBIA incurred thereafter were Defense Costs within the meaning of Defendants' policies.  Likewise, once *Orton* was filed in April 2006, all of the associated costs, and expenses were Defense Costs within the meaning of Defendants' policies.  In short, the vast majority of the costs incurred with respect to the Derivative Actions are covered Defense Costs and are not mere Investigation Costs.

51.     Finally, ACE's position that its policy will not attach unless Federal, itself, pays its full policy limits, even if MBIA's Loss greatly exceeds Federal's limits, runs counter to (i) its own policy language, which indicates that ACE's obligation attaches if a loss exceeds the amount of the underlying insurance, regardless of whether an underlying insurer has paid its policy's limits; (ii) controlling judicial authority; and (iii) public policy.

52.     MBIA explained to Federal and ACE why the above positions are incorrect. Federal and ACE have nevertheless refused to change their coverage positions.

53.     In addition, although Federal has agreed to pay, and has paid, most of MBIA's defense costs incurred in connection with the Class Action, Federal also reserved its rights to ultimately deny coverage to MBIA for all such costs as well as any damages or other costs incurred through settlement or judgment.  ACE has similarly reserved its rights.  Defendants' failure to consent to MBIA's making efforts to settle the Class Action was not reasonable and,

14

given that Defendants have reserved their rights to deny coverage, MBIA has been improperly

exposed to the possibility of having to incur further defense costs as well as the possibility of

incurring a greater legal liability than MBIA would have incurred through settlement.  Based on

Defendants' coverage denials with respect to the regulatory investigations and Derivative

Actions, it is possible, if not likely, that Defendants also will deny coverage for some, if not all,

of any defense costs or any legal liability incurred in connection with the Class Action.

**FIRST CLAIM FOR RELIEF**
**Breach of Contract – Duty to Pay in Full the Total Defense Costs**
**Relating to the SEC and NYAG Investigations**

54.     MBIA repeats and realleges paragraphs 1 through 53, as if set forth fully herein.

55.     The insurance policies that Defendants sold to MBIA obligate Defendants to pay

in full MBIA's total defense costs arising from both the SEC and NYAG regulatory

investigations.

56.     Defendants have breached their contractual and common law obligations to

MBIA by their failure and refusal to fulfill their obligations to, among other things, pay in full

MBIA's total defense costs in the SEC and NYAG regulatory investigations.

57.     As a direct and proximate cause of Defendants' breaches of contract, which

continue to at least the time of the filing of this Complaint, Defendants have deprived MBIA of

the benefits of the insurance contracts, for which MBIA paid substantial premiums.  MBIA has

sustained damages due to Defendants' breaches of contract.

15

64.     Defendants have breached their contractual obligations to MBIA by their failure and refusal to pay MBIA in full the total costs of defending certain of its directors and officers in the Derivative Actions.

65.     As a direct and proximate result of Defendants' breaches of contract, which continue to at least the time of the filing of this Complaint, Defendants have deprived MBIA of the benefits of the insurance contracts, for which MBIA paid substantial premiums.  MBIA has sustained damages due to Defendants' breaches of contract.

### FOURTH CLAIM FOR RELIEF
**Declaratory Judgment – Duty to Pay in Full the
Total Loss Arising From the Class Action**

66.     MBIA repeats and realleges paragraphs 1 through 53, as if set forth fully herein.

67.     The insurance policies that Defendants sold to MBIA obligate Defendants to pay in full any Securities Loss or Loss that MBIA incurs in connection with the Class Action, including all defense costs, as well as all damages or other liabilities that may be incurred in connection with settlements or judgments in the Class Action.

68.     Defendants have unreasonably withheld consent for MBIA to pursue a settlement of the Class Action.  Defendants also have reserved their rights with respect to the Class Action and have, therefore, refused to acknowledge that, pursuant to the terms of their insurance policies, they must indemnify and pay in full any Securities Loss or Loss MBIA incurs in connection with the Class Action, including all defense costs, as well as all damages or other liabilities that may be incurred in connection with settlements or judgments in the Class Action. Accordingly, an actual and justiciable controversy presently exists between MBIA and Defendants as to whether Defendants must pay in full any Securities Loss or Loss MBIA incurs

17

in connection with the Class Action, including all defense costs, as well as all damages or other liabilities that may be incurred in connection with settlements or judgments in the Class Action.

69.     MBIA needs and is entitled to a judicial declaration that Defendants' insurance policies obligate Defendants to indemnify MBIA in full for any Securities Loss or Loss MBIA incurs in connection with the Class Action, including all defense costs, as well as all damages or other liabilities that may be incurred in connection with settlements or judgments in the Class Action.

**PRAYER FOR RELIEF**

**WHEREFORE,** MBIA respectfully requests judgment be entered against Defendants as follows:

1.     On the First Claim for Relief:

    a.     A finding that Defendants breached their obligations set forth in the insurance policies that they sold to MBIA by their failure and refusal to pay in full MBIA's total Defense Costs arising from both the SEC and NYAG regulatory investigations; and

    b.     Damages according to proof at the time of trial; and

    c.     MBIA's costs and attorneys' fees incurred in obtaining benefits under Defendants' insurance policies.

2.     On the Second Claim for Relief:

    a.     A finding that Defendants breached their obligations set forth in the insurance policies that they sold to MBIA by their failure and refusal to indemnify MBIA for its Securities Loss, by refusing to pay the costs of the Independent Consultant for which MBIA is legally liable under the terms of MBIA's settlements with the regulators.

    b.     Damages according to proof at the time of trial; and

18

       c.      MBIA's costs and attorneys' fees incurred in obtaining benefits under Defendants' insurance policies.

    3.      On the Third Claim for Relief:

       a.      A finding that Defendants breached their obligations set forth in insurance policies that they sold to MBIA by their failure and refusal to pay in full MBIA's total Defense Costs in connection with the Derivative Actions; and

       b.      Damages according to proof at the time of trial; and

       c.      MBIA's costs and attorneys' fees incurred in obtaining benefits under Defendants' insurance policies.

    4.      On the Fourth Claim for Relief:

       a.      A declaration that Defendants must indemnify and pay in full all Securities Loss or Loss that MBIA incurs with respect to the Class Action, including all defense costs, as well as all damages or any other liabilities that may be incurred in connection with settlements or judgments in the Class Action; and

       b.      MBIA's costs and attorneys' fees incurred in obtaining a declaration that Defendants' owe MBIA such benefits under their insurance policies.

19

## JURY DEMAND

MBIA demands a trial by jury of any and all issues properly triable by a jury in this action.

Dated: New York, New York
May 21, 2008

James G. McCarney
Amory W. Donelly
HOWREY LLP
Citigroup Center
153 East 53rd Street, 54th Floor
New York, New York 10022
(212) 896-6500

Robert F. Ruyak
Robert P. Jacobs
Lara A. Degenhart
Christine S. Davis
HOWREY LLP
1299 Pennsylvania Avenue, N.W.
Washington, DC  20004
(202) 783-0800
(202) 383-6610

*Attorneys for Plaintiff*

DM_US:21238538_1